The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO.   CR05-381TSZ |
| | ) | |
| Plaintiff, | ) | UNITED STATES' RESPONSE |
| | ) | TO DEFENDANT ALMUSSA'S |
| v. | ) | MOTION FOR NEW TRIAL |
| | ) | |
| AKRAM ASWAD ALMUSSA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.  INTRODUCTION

Defendant's motion for a new trial presents two main arguments.  First, the defense, again, complains that the government "suppressed" certain <u>Brady</u>/<u>Giglio</u> material relating to Matt McGhee.  Second, the defense, again, alleges that the government presented false testimony from co-defendant Josh Kebede and other witnesses.  Defendant has repeatedly made both of these arguments to the Court in support of past motions to dismiss and for other relief.  The Court correctly rejected these arguments in the past, and it should do so again here.

As to the alleged suppression of the McGhee materials, the defense was not prejudiced in any way.  Defendant called Mr. McGhee, who testified consistent with the report provided to the defense.  In addition, the defense called  another witness who largely supported Mr. McGhee's account of wrongdoing at the Bellevue office of New Century Mortgage Corporation.  The jury heard this testimony, and nonetheless

1  returned a guilty verdict.  Accordingly, there are no grounds for a new trial due to the

2  "late" disclosure of the reports.

3      As to the alleged presentation of perjured testimony, this argument fails for three

4  reasons.  First, Mr. Kebede's and Ms. Lalander's testimony was not materially false.

5  Second, the discrepancies in their testimony were not knowingly solicited by the

6  government.  Third, and most important, the defense fully presented its argument

7  regarding the alleged false testimony to the jury.  Indeed, this allegation was the central

8  theme of defense counsel's closing argument.  The jury, by returning a verdict of guilty

9  on all counts, has necessarily rejected this argument.  The Court should do so as well.

## II.  FACTUAL BACKGROUND

**A.   THE McGHEE REPORTS**

12     Matthew McGee was an underwriter for New Century Mortgage Company, the

13  lender for eight out of the ten charged real estate transactions in this case.  He was the

14  underwriter responsible for conditioning and approving the loans submitted by

15  Mr. Almussa to New Century.

**1.   New Century's Internal Investigation of McGhee**

17         Mr. McGhee and others at New Century were the subject of internal

18  investigation by the mortgage company regarding loans made for the benefit of

19  Defendant in violation of corporate policies.  As part of the investigation, corporate

20  investigators interviewed Mr. McGhee in Hawaii.  In that interview, Mr. McGhee,

21  among other things, denied he knowingly approved bad loans for Mr. Almussa;

22  instead, he claimed that any irregularities regarding those loans were the result of his

23  ignorance and innocent mistake.  He also (falsely) denied ever receiving money from

24  Almussa.  Mr. McGhee was nonetheless terminated by New Century.

25     The entire New Century Investigation file was obtained by the government

26  pursuant to a Grand Jury subpoena, and was turned over to defense counsel in the

27  Spring of 2006.  In short, the defense had information pertaining to Mr. McGhee, as

28

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 2
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

well as other local employees of New Century, more than six months prior to the ultimate trial date.

### 2.    McGhee's Interview with the FBI

On September 6, 2006, Mr. McGhee agreed to be interviewed by the FBI with the consent of his counsel.  During the interview, Mr. McGhee was again asked whether he knowingly assisted Mr. Almussa with processing fraudulent loans.  He denied doing so.  He was also asked why Almussa would have paid him money while he was working as an underwriter for New Century.  McGhee originally denied ever receiving money from Almussa; when pressed, he admitted to having received $1,000 from Almussa for referring a loan to him.  He then later admitted to having received cash from him as well.

During this same interview, he also disclosed that he had been fired from a prior underwriting job after being accused of sexual misconduct with a fellow employee.

The next day, on September 7, 2006, Mr. McGhee returned to the FBI and voluntarily submitted to a polygraph examination.  *After* the test, Mr. McGhee claimed for the first time that he and others at New Century participated in overstating income on some loan applications with the approval of their supervisors.  McGhee described increasing the income on some applications by "at most" $2,000 - $3,000.[1]

However, Mr. McGhee continued to deny that he knowingly processed any fraudulent stated income loans submitted by *Mr. Almussa* in that manner, with one possible exception.  He also continued to deny that he was aware Mr. Almussa's loans contained false employment information.  Mr. McGhee also consistently denied that he knew that Mr. Almussa was also personally involved in the real estate transaction himself as a seller to the straw buyers/borrowers.  In short, Mr. McGhee made it clear

---

[1]  By contrast, the stated income on the loans at issue in this case were typically increased by anywhere from $5,000 - $8,000.

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 3
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

that his allegations of irregularities at New Century's Bellevue office had little or nothing to do with the specific facts of this case.

The case agent, Special Agent Joe Quinn, called AUSA Lombardi that day to generally advise him of the content of the interview.  AUSA Lombardi asked for a copy of the interview report.

### 3.    Provision of the FBI Reports to the Defense

The second interview of Mr. McGhee was jointly conducted by the polygrapher, Special Agent Raymond Lauer, and Agent Quinn.  Accordingly, both agents had to sign off on the report.  Shortly after the interview, Agent Lauer typed up his portion of the report in draft form, and provided it to Agent Quinn for completion and review.  Almost immediately after doing so, Agent Lauer left for a temporary assignment in Iraq, and did not return until October 15, 2006.

Agent Quinn finished his portion of the report and returned the completed draft to Agent Lauer for his review, where it sat until Agent Lauer returned from Iraq.

As the Court is aware, defense counsel left the country on an extended vacation trip to Europe on or about October 16, 2006, and was not originally scheduled to return until November 13, 2006.  *See* Declaration of Unavailability, Docket # 83.

Sometime in early November, AUSA Lombardi reminded Agent Quinn that he needed all outstanding 302s completed, including the McGhee report.  Agent Quinn provided the reports to AUSA Lombardi towards the end of the week of November 7, 2006.  The United States then provided the reports to the defense on November 15, 2006 at the time of the pretrial conference, which was only days after Mr. Wayne's originally scheduled return.

### 4.    The Bellevue Police Department Reports

Mr. McGhee was again interviewed on or about December 2, 2006, during the trial.  During this interview Mr. McGhee was questioned regarding (among other topics) his prior work history.  He provided more details about the circumstances

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 4
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   of his termination from a prior underwriting job for alleged sexual misconduct.  A

2   report of interview was promptly prepared, and provided to defense counsel on Monday

3   or Tuesday, December 4 or 5, before the government rested its case.

4        Special Agent Quinn then obtained a copy of the Bellevue Police Department file

5   regarding this incident sometime the following Monday, December 4, 2006, and

6   provided it to the prosecution team shortly thereafter.  Inside that file was a letter to the

7   police from Mr. McGhee's then counsel.  In that letter, Mr. McGhee's counsel

8   admitted that Mr. McGhee had initially lied to his employer about the circumstances of

9   the encounter that led to the misconduct charge.  That letter was not reviewed in detail

10  by the prosecution the evening of Wednesday, December 6, 2006, when counsel began

11  preparing for Mr. McGhee's cross-examination the next day.

12       The defense did call McGhee in its case, and elicited testimony from him about

13  loose loan standards (and worse) in the Bellevue office of New Century regarding the

14  income portion of "stated income" loan applications.  A copy of the letter written by

15  McGhee's counsel to the Bellevue PD was provided to the defense Thursday morning,

16  December 7, 2006, while the defense was still in the midst of its direct exam of

17  McGhee.

18       The defense notes in its motion that the government "did not want to call

19  Mr. McGhee."  This is certainly correct, given his history of serial misstatements to

20  investigators, and his obvious bias against the employer who terminated him.

21       In the end, Mr. McGhee's testimony was largely favorable to the government.

22  On direct, McGhee continued to maintain that New Century was careless, or worse,

23  when it came to the income it would accept on stated income loans.  This testimony

24  arguably supported the defense theory that the income figure was *not* material to New

25  Century, the very reason they called him as a witness.

26       However, on cross-examination, McGhee went on to testify that the **other**

27  misstatements orchestrated and procured by Defendant *were* material.  These included

28

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 5
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

the lies about the purpose of the loan (owner-occupancy vs. investment) and the employment information.  They also included the concealment of the "flip" nature of the transactions, and Almussa's involvement as a buyer/seller.  Mr. McGhee flatly testified that he would not have made the loans if he had known the truth about these facts.

The defense also called another former employee of New Century, identified by Mr. McGhee, who corroborated much of McGhee's testimony.

**B.    THE TESTIMONY OF KEBEDE AND LALANDER**

The defense alleges that Kebede (and other witnesses, such as Lalander and Sahagun) testified falsely in the government's case.  The defense has failed to meet its preliminary burden of showing a material misstatement by any of these witnesses.  Even where the testimony contained discrepancies or inaccuracies, the defense exposed the discrepancy before the jury.

**1.    Kebede's Testimony**

a.    <u>Kebede's Involvement in the Other Conspiracy</u>

Mr. Kebede provided the government with an extensive proffer regarding his involvement in a similar fraud scheme on February 21, 2006, which is the subject of a joint investigation between the King County Prosecuting Attorney's Office, the Washington State Department of Financial Institutions, and the FBI.  That scheme involved a different conspiracy and a different set of co-conspirators.  Other than the similarity of the two schemes, and Kebede's involvement, the two cases are unrelated.  A report of Kebede's proffer interview was provided to the defense well before trial.  A copy of the report was also provided to the Court during the trial.

In his interview, Mr. Kebede admitted to starting out with the other conspiracy as a runner/recruiter of other straw buyers.  He then "graduated" to directly participating in flip transactions, starting first with the Carol King transaction.  As the Court may recall, Carol King was the wife of Ken King, who testified at trial and

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 6
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    whose transaction was charged as part of Count 1 of the Indictment of this case.

2    During his interview, Mr. Kebede stated that he did not receive the money he thought

3    he should have received from the Carole King transaction to fix up the house.  He also

4    said that he later received some money to help pay the mortgage from other members

5    of that separate conspiracy.

6        Mr. Kebede pleaded guilty to these charges on April 28, 2006.  As part of the

7    fact statement set forth in the plea, he admitted to conspiring with Almussa.  He *also*

8    generally admitted to conspiring with the members of the other conspiracy.  *See* Plea

9    Agreement, Dkt. # 76, at page 5, line 3, identifying some of the other conspirators by

10   their initials.  A copy of Mr. Kebede's plea was also provided to the defense well in

11   advance of this trial.

12          b.    <u>Mr. Kebede's Testimony Was Consistent with His Interview, and</u>
                  <u>Not Materially False</u>

13

14       Mr. Kebede's testimony was not materially false.  First, it was intended

15   to comply with the Court's order in limine, solicited by the defense, that limited the

16   introduction of other transactions in the case.  Second, Mr. Kebede's testimony was

17   literally correct, given that limitation.  Third, even if Mr. Kebede's testimony was

18   incorrect in some respects, Defendant's lengthy cross - based entirely on reports

19   provided to the defense by the government - corrected any mistaken impression left by

20   his direct testimony.

21       First, it is important to recall that the Court had entered an order in limine

22   prohibiting the government from discussing any other transactions, except in passing as

23   it might relate to a charged transaction.  The Court did so at the defendant's specific

24   request.  In Defendant's Trial Brief and Motions in Limine (Dkt # 122) Defendant

25   moved the Court to prohibit reference to "other transactions."  Contrary to the defense

26   argument, this request was not limited in any way.

27       The government responded that it did not intend to refer to other transactions,

28   except in as much as it might be necessary to describe the context for transactions that

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 7
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

were charged.  For example, William and Caryl Estes both acted as straw buyers, and received just one check for their participation.  Ken and Carol King each acted as straw buyers, and were recruited together.

The Court orally granted the defense motion without qualification.  The government's witnesses - including Mr. Kebede - were therefore instructed to avoid discussing other transactions.

On direct examination, the government did attempt to elicit that Mr. Kebede had been involved in prior fraudulent transactions, *before* meeting Mr. Almussa.  This was done in an attempt to show that Mr. Kebede's involvement in this type of scheme predated his association with Almussa.  It was also done to avoid defense accusations that the government was attempting to whitewash Mr. Kebede's prior criminal activities.

Mr. Kebede responded by discussing in a general fashion his prior involvement with a completely different corrupt mortgage broker, M.K.[2] as part of the other conspiracy.  He specifically mentioned his participation as the buyer/seller in a prior "flip" transaction pertaining to Ken King's wife, Carol King.  Mr. Kebede testified that this was the first flip he had been involved with as a buyer/seller.  This appears to be a correct statement.  It was also completely consistent with his prior interviews with the government.

It is true that Mr. Kebede did not mention his prior involvement with the other conspiracy in other capacities, basically as a recruiter of straw buyers.  However, this was hardly a material omission.  It is also unsurprising, given (a) the order in limine, and (b) Mr. Kebede's imperfect English.

---

[2]  Unlike the defense, the government has a continuing obligation to minimize references to uncharged targets/subjects in its public filings.

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 8
(Almussa, CR05-381TSZ)

c. The Defense Vigorously Cross-Examined Kebede

The government's direct exam of Mr. Kebede lasted approximately 45 minutes. The defense's cross-examination lasted close to three and a half hours. Significantly, virtually all of defense counsel's cross-examination pertained to Kebede's involvement in the other completely separate and uncharged conspiracy. **These questions were essentially all based on the proffer report prepared by the government and provided to the defense.** During the course of the cross, all of the misstatements and omissions allegedly made by Kebede were fully aired before the jury, at length and in great detail.

**2. Lalander's Testimony was Not Materially False**

The defense also contends that Nancy Lalander provided false testimony. No transcript was ordered or provided, so for purposes of this response only, the government will accept the version of Ms. Lalander's testimony contained in Defendant's motion. In essence, the defense contends that Ms. Lalander lied because she said she met Mr. Almussa twice, when in her prior interview she said she'd only met him once. The problem with this argument is threefold.

First, it hardly establishes that Ms. Lalander perjured herself; instead it establishes that she has made inconsistent statements, which is hardly the same thing. Witnesses make inconsistent statements at times, particularly witnesses (like Ms. Lalander) who are elderly, in poor health, and are testifying about events that happened years before the trial.

Second, the discrepancy is hardly material. The essential fact was that Ms. Lalander did meet with Mr. Almussa, and that the loan application he prepared (a fact not in dispute) contained material misstatements about her income, her employment, and the purpose of the loan.

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 9
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    Third, and most important, the defense also aired out these alleged discrepancies

2   before the jury as well, both during a vigorous cross-examination and by calling Agent

3   Quinn in an attempt to impeach Ms. Lalander on the details of her testimony.

4                            **III.  <u>ARGUMENT</u>**

5    At the close of trial, the Court stated, on the record, that it was satisfied that the

6   defendant had been well represented and that the trial had been fair.  Accordingly, the

7   motion for a new trial should be denied.  "Motions for a new trial are directed to the

8   broad discretion of the trial judge, who may weigh the evidence and evaluate the

9   credibility of witnesses in considering such a motion.  However, the remedy of a new

10   trial is sparingly used, and then only where there would be a miscarriage of justice ···

11   and where the evidence preponderates heavily against the verdict."  <u>U.S. v. Wilkerson</u>,

12   251 F.3d 273, 280 (1st Cir. 2001) (internal quotations and citations omitted).

13   **A.    THE ALLEGED <u>BRADY</u> VIOLATIONS DO NOT MANDATE
        A NEW TRIAL**

14

15    In the various arguments presented to this Court, including the pending motion,

     Defendant has claimed that the government violated its discovery obligations, focusing

16   chiefly on allegations of violations of the requirements set forth in <u>Brady v. Maryland</u>,

17   373 U.S. 83 (1963).  To place these claims in context, a review of the government's

18   discovery obligations is appropriate.

19   **1.    Rule 16 of the Federal Rules of Criminal Procedure**

20    The Supreme Court has held that "there is no general constitutional right to

21   discovery in a criminal case, and <u>Brady v. Maryland</u>, which addressed only exculpatory

22   evidence, 'did not create one.'"  <u>Gray v. Netherland</u>, 518 U.S. 152, 168 (1996) (quoting

23   <u>Weatherford v. Bursey</u>, 429 U.S. 545 (1977)).  Thus, the general discovery obligations are

24   those created by Federal Rule of Criminal Procedure 16.

25    Under Rule 16, the government has an obligation to make available to the defense,

26   in advance of trial, various categories of documents, to include specified statements of the

27   defendant, documents or other tangible evidence, reports of examinations or tests, and

28

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 10
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   specific discovery concerning expert witnesses.  However, Rule 16 does not require

2   production of everything in the government's files or everything about which the

3   government learns prior to trial.

4          **2.**       **The Jencks Act, 18 U.S.C. § 3500**

5          The Jencks Act, 18 U.S.C. § 3500, was enacted in 1957 to clarify and limit the

6   Supreme Court's holding in <u>Jencks v. United States</u>, 353 U.S. 657 (1957).  Along with

7   Federal Rule of Criminal Procedure 26.2, which incorporates the statute into the Federal

8   Rules of Criminal Procedure, the Jencks Act requires the government to produce those

9   statements made by trial witnesses that are in its possession.  The term "statement" is

10   defined to include a "written statement made by the witness," a writing that constitutes a

11   "substantially verbatim recital of an oral statement made by said witness," or grand jury

12   testimony by the witness.  <u>See</u> 18 U.S.C. § 3500(e).  Although such statements are

13   generally produced in advance of trial to avoid delays in the trial, a defendant is not

14   entitled to the production of any materials that fall within the definition of "statements"

15   until *after* the witnesses have testified.  <u>United States v. Barker</u>, 988 F.2d 77, 78-79

16   (9th Cir. 1993).

17          More importantly, the Ninth Circuit has stated: "<u>Brady</u> does not overcome the

18   strictures of the Jencks Act.  When the defense seeks evidence which qualifies as both

19   Jencks Act and <u>Brady</u> material, the Jencks Act standards control."  <u>United States v. Jones</u>,

20   612 F.2d 453, 454 (9th Cir. 1979).  This holding was most recently reaffirmed in

21   <u>United States v. Alvarez</u>, 358 F.3d 1194, 1211 (9th Cir. 2004).  Thus, under the law of

22   this Circuit, the disclosure of <u>Brady</u> material contained in the statement of a witness is

23   timely so long as it is provided within the time period set forth in the Jencks Act.

24          **3.**       **<u>Brady v. Maryland</u> and <u>Giglio v. United States</u>**

25          Under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the government is

26   required to provide a defendant any evidence favorable to the accused and material to

27   guilt or punishment.  <u>Brady</u> principles extend to evidence affecting *government*

28

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 11
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

witnesses' credibility.  <u>Giglio v. United States</u>, 405 U.S. 150, 153-55 (1972).  There is a distinction between favorable evidence (i.e., <u>Brady</u> information) and a <u>Brady</u> violation.  As the Supreme Court explained in <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999):

> [T]he term "Brady violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence – that is, to any suppression of so-called "Brady material" -- although, strictly speaking, there is never a real "Brady violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.  There are three components of a  true Brady violation: The evidence at issue must be favorable to the accused either because it is exculpatory, or because it is impeaching; that the evidence must have been suppressed by the state, either willfully or inadvertently; and prejudice must have ensued.

Favorable evidence that is unknown to the government or not in existence at the time of trial is irrelevant to a <u>Brady</u> claim.  <u>United States v. Souffront</u>, 338 F.3d 809 n. 6 (7th Cir. 2003); <u>United States v. Josleyn</u>, 206 F.3d 144, 153-54 (1st Cir. 2000); <u>United States v. Lafayette</u>, 983 F.2d 1102, 1106 (D.C. Cir. 1993).  Similarly, where "suppressed information" was revealed during direct or cross-examination of a witness, there is no <u>Brady/Giglio</u> violation.  <u>United States v. Reyes</u>, 270 F.3d 1158, 1166 (7th Cir. 2001); <u>United States v. McElhiney</u>, 275 F.3d 928, 933 (10th Cir. 2001);  <u>United States v. Koehler</u>, 266 F.3d 937 (8th Cir. 2001).

Moreover, late disclosure of <u>Brady</u> material does not automatically warrant reversal of a defendant's conviction.  <u>United States v. Alvarez</u>, 86 F.3d 801, 905 (9th Cir. 1996); <u>United States v. Diaz-Rodriguez</u>, 478 F.2d 1005, 1008 (9th Cir. 1973).  The failure to disclose evidence requires reversal of a conviction *only* if the evidence is material.  <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985) (holding that evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different").

To escape reversal under <u>Brady</u>, disclosure must have been made at a time when the disclosure was of value to the accused.  <u>United States v. Gordon</u>, 844 F.2d 1397,

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 12
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1403 (9th Cir. 1988); United States v. Davenport, 753 F.2d 1460, 1462 (9th Cir.

1985).  A delay in disclosure requires reversal **only** if it so prejudices a defendant's

presentation of his defense that he is prevented from receiving a fair trial.  United

States v. Shelton, 588 F.2d 1242, 1247 (9th Cir. 1978).  When a defendant is able to

make effective use of late-delivered Brady material, the Ninth Circuit consistently has

held that there is no prejudice.  United States v. Vgeri, 51 F.3d 876 (9th Cir. 1995)

(affirming conviction where government disclosed during trial that informant had been

involved in the burglary of codefendant's house and defense counsel cross-examined

informant on subject); Gordon 844 F.2d 1397 (affirming conviction where log sheets

impeaching government's main witness were turned over after government's case-in-

chief and defense was allowed to enter log sheets into evidence).

There is no question that a Brady or Giglio violation is a serious matter, even

where the prosecutor's failure to turn over material was the result of mistake rather than

deliberate withholding.  United States v. Alvarez, 86 F.3d 901, 905 (9th Cir. 1996).

Nevertheless, such failure to turn over Brady and Giglio information does not

automatically warrant a mistrial.  See Alvarez, 86 F.3d at 905 (9th Cir. 1996).  Nor does it

automatically warrant reversal on appeal, or a grant of a new trial.  See United States v.

Miller, 529 F.2d 1125, 1128 (9th Cir.1976); United States v. Diaz-Rodriguez, 478 F.2d

1005, 1008  (9th Cir. 1973).

To prevail on a claim that the government failed to comply with its obligations

under Brady, the defendant must show that : (1) the evidence was exculpatory or

impeaching; (2) it should have been, but was not produced; and (3) the suppressed

evidence was material to his guilt or punishment.  United States v. Antonakeas,

255 F.3d 714, 725 (9th Cir. 2001).   Under Brady, the evidence is only material if there is

a "reasonable probability that the *result* of the proceeding would have been different had

it been disclosed to the defense." United States v. Service Deli, Inc., 151 F.3d 938, 943

(9th Cir. 1998) (emphasis added).

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 13
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    In United States v. Alvarez, 86 F.3d 901, 905 (9th Cir. 1996), the prosecutor in a

2    drug trafficking trial had committed a series of Brady and Giglio violations.  During trial,

3    the prosecutor turned over notes of investigators that were exculpatory.  One of the notes

4    referred to a person named "Oscar LNU" as the person who had distributed a 935

5    kilogram drug load, and not the defendant.  The prosecutor also failed to turn over

6    statements of a government witness which, although facially exculpatory, were believed

7    by the prosecutor to be false.  This, too, was a Brady/Giglio violation: "the prudent

8    prosecutor will resolve doubtful questions in favor of disclosure."  Alvarez, 86 F.3d at

9    905 (quoting United States v. Agurs, 427 U.S. 97, 108 (1976)).  Nevertheless, in spite of

10   these clear violations by the prosecutor, the Alvarez court concluded that "no reversible

11   Brady error occurred" because in the final analysis, the defendant was not seriously

12   prejudiced.   Alvarez, 86 F.3d at 905.  The court stated:

13             The prosecutor did in fact disclose Ramirez's statement to the
              defense.  The prosecutor also eventually reviewed the
14            officers' rough notes and turned over these notes that
              contained discrepancies.  Although this should have been
15            done earlier, we are confident that Cuevas [the defendant]
              was not prejudiced by the government's delay.  Cuevas was
16            able to cross-examine Investigator Smith fully regarding the
              discrepancies in his report.  Although Cuevas complains that
17            the government was able to examine Smith first about the
              discrepancy, thereby diffusing its force, the government
18            would have been able to do so anyway, even if it had
              disclosed the information in a timely manner.  After the
19            prosecutor finally turned over this material, . . . Cuevas made
              no showing that there was additional exculpatory information
20            the government was  suppressing . . . ."

21   Id.

22            Similarly, in United States v. Miller, 529 F.2d 1125 (9th Cir. 1976), the prosecutor

23   failed to turn over critical statements by two of the government's witnesses, in which they

24   recanted their prior statements regarding the defendant's having prepared false income

25   tax returns, and implicated another man, Mills, as the preparer of the false return.  Id. at

26   1127-28.  When confronted by the government, Mills confessed.  Id.  As a result, the

27   government dismissed several counts against the defendant Miller.  Yet, only towards the

28

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 14
(Almussa, CR05-381TSZ)

1    end of Miller's trial did the government inform defense counsel of Mills's confession.

2    The Ninth Circuit concluded that the government's failure to promptly disclose this

3    exculpatory evidence was clearly "misconduct."  Nevertheless, the court continued, <u>Brady</u>

4    does not require reversal:

5            First, unlike Brady, there was no complete suppression
             of the exculpatory evidence.  Appellant learned of the Mills
6            statement at trial, albeit not until towards the close of his defense.
             Thus our inquiry on appeal . . . . is whether the lateness of
7            the disclosure so prejudiced appellant's preparation or presentation
             of his defense that he was prevented from receiving his
8            constitutionally guaranteed fair trial.

9    <u>Id</u>. at 1128 (citation omitted).   The Court concluded it did not, in part because the defense

10   had been aware of the witnesses' existence for some weeks prior to trial.

11       **4.      The Late Disclosure of the Pretrial Interview Reports of McGhee Do
                   Not Mandate a New Trial, Because the Defense Made Effective Use of
12                 the Material**

13           Applying these principles to the case at bar, it's clear that the alleged

14   <u>Brady</u> violations do not mandate a new trial.  The government had provided some

15   information about McGhee to the defense months before trial, so his existence and

16   potential relevance as a witness was known to the defense.  The government provided

17   the specific reports at issue in this motion to the defense on November 15, 2006, a

18   week and a half *before* trial commenced.

19       As set forth above, there are reasons behind this delay; however, the government

20   concedes that it would have been better if the reports had been provided to the defense

21   earlier.  Nonetheless, the defense was able to subpoena McGhee, and he testified at

22   trial consistent with the defense theory of the case.

23       In addition, the defense was able to locate and subpoena several other witnesses

24   who allegedly had information corroborating McGhee's account of the local practice in

25   the Bellevue office of New Century.  The defense actually called one of these

26   witnesses, who corroborated parts of McGhee's story.

27

28

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 15
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

In short, there is no evidence that the delay in providing the reports prejudiced the defense in any way.  Defendant was able to fully present the evidence that McGhee had at trial, in support of his theory of the case that some of the misrepresentations orchestrated by Almussa were not in fact material.  The jury heard that evidence, considered it, and ultimately rejected it in reaching its verdict of guilty on all counts.

**5.     The "Late" Disclosure of Impeachment Information about McGhee - a Defense Witness - Was Entirely Proper**

The defense suggests that the government's "late" disclosure of impeachment material about McGhee, a defense witness, violated some type of discovery obligation.  This is simply incorrect.  None of the rules cited above require the government to *ever* produce impeachment material pertaining to a defense witness; instead, they all pertain to witnesses called by the government.  The defense cites no legal authority to support its argument to the contrary, because there is no such authority.

The defense argument, in essence, is that the government has an obligation to turn over all evidence, of any type, to the defense; and to do so almost immediately after it comes into the government's possession.  This argument was rejected in U.S. v. Bagley, 473 U.S. 667, 675 (1985): "The Brady rule is based on the requirement of due process.  Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur.  Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence *favorable* to the accused that, if suppressed, would deprive the defendant of a fair trial . . ."  (emphasis added, citations and footnotes omitted).

Of course, impeachment evidence about the ***government's*** witnesses is "evidence favorable to the accused" within the meaning of Brady and Giglio.  However, Impeachment evidence regarding the ***defendant's*** witnesses is not such evidence, and is simply not covered by the rule.  See also, U.S. v. Green, 178 F.3d 1099, 1109 (10th Cir. 1999) (Giglio applies only to impeachment information relating to a government

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 16
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

witness - no discovery violation where the government fails to turn over impeachment information regarding an individual the government does not call at trial).

**B.   THE ALLEGED PERJURED TESTIMONY DOES NOT MANDATE A NEW TRIAL**

To prevail on a claim that the defendant should receive a new trial based on allegedly perjured testimony, the defendant has the burden of showing that "(1) testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material."  United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003).

1.   Neither Kebede nor Lalander Perjured Themselves

As set forth above, the defense has failed to show that either Kebede or Lalander perjured themselves; at most, the defense has proven that their testimony was incomplete and/or inconsistent when compared to statements they gave earlier to law enforcement.  This is, of course, not quite the same thing - particularly where, as here, the witnesses in question either spoke English as a second language (Kebede), or were elderly and testifying about events that happened a considerable period of time prior to trial (Lalander).  Perjury requires something more than evidence that the witness gave a statement that was arguably inconsistent with prior statements.  Instead, it requires proof that the witness "'knowingly and willingly' gave 'materially false' testimony.  18 U.S.C. § 1001(a)(2)."  United States v. Salameh, 54 F. Supp.2d 236, 261, 262, fn 27 (S.D.N.Y. 1999).  Defendant has not proven actual perjury in this matter.

2.   The Government did not Intentionally Introduce Perjured Testimony

During the trial, the Court specifically found that the government had not knowingly presented false testimony, and there is no reason to revisit that determination here.  As to Kebede's testimony, the government was attempting to comply with the Court's order in limine precluding introduction of evidence of other transactions, and had instructed its witnesses accordingly.  The government introduced the fact that Kebede had been involved in committing this particular type of crime before he met

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 17
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Mr. Almussa, which was of course an important fact.  The government was not required to (and indeed, believed itself precluded from) discussing in detail those other transactions.  But for that order, the government would have spent more time discussing Mr. Kebede's other conduct.

The best evidence showing the government did not intentionally introduce perjured testimony is found in the discovery provided to the defense.  Defense counsel's effective, lengthy and detailed cross-examination of Kebede and Lalander was **not** based on the defense's independent investigation.  Instead, the cross-exam regarding their allegedly inconsistent statements was wholly drawn from reports and other material provided to the defense *by the prosecution*.  It is simply illogical to suggest that the government would turn over to the defense reports containing a particular version of events, and then intentionally put on testimony that flatly contradicts that version, knowing that the defense would use the material to cross-examine the witnesses.

       3.     <u>Any Alleged Perjury did Not Impact the Verdict, because the Facts were</u>
                 <u>Fully Explored before the Jury</u>

Finally, even if the defense has somehow satisfied the first two prongs of this test, it has failed to show that the allegedly false information was material to the outcome.  It is not enough to show that the testimony was perjured, or even that the government knew it was untrue; the defense must also show that the false testimony made a difference at trial.  Under the materiality standard, the Court must determine whether there is a reasonable likelihood that the false statement could have affected the judgment of the jury.

//

//

//

> Although a prosecutor's presentation of tainted evidence is viewed seriously and its effects are exceedingly carefully scrutinized, **a new trial is not automatically granted**. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); Thomas v. Cardwell, 626 F.2d 1375, 1381 (9th Cir.1980), cert. denied, 449 U.S. 1089, 101 S.Ct. 881, 66 L.Ed.2d 816 (1981). A finding of materiality of the evidence is required. Giglio, 405 U.S. at 154, 92 S.Ct. at 766. A new trial is in order if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Id.

U.S. v. Polizzi, 801 F.2d 1543, 1550 (9th Cir. 1986) (emphasis added).  In Polizzi a government witness denied having acted in the past as an "informant" which was arguably untrue.  The Ninth Circuit nonetheless affirmed the guilty verdict, in part because the witness had been so "thoroughly impeached" on cross-examination, such that there was "not any reasonable likelihood that the correction [of the alleged perjury] would have affected the jury's verdict." Id. at 1551.

Likewise, the defense is unable to meet this burden in this case, because the alleged falsehoods were fully explored before the jury on cross-examination.  All of the cases cited by the defense are distinguishable, because they all involve situations where the evidence showing the testimony was false was discovered AFTER the trial was over, when it was too late to be of use.  By contrast, in this case, the defense had (from the government's own files) the reports that allegedly show the testimony was false, and used that information to cross-examine the witnesses.

In United States v. Cavell, 257 F. Supp 204 (M.D.Pa. 1966), the petitioner filed a petition for a writ of habeas corpus, alleging that he was convicted on perjured testimony.  Specifically, the chief witness at trial against petitioner was a former co-conspirator.  The co-conspirator had earlier proclaimed his innocence at his own trial, under oath.  He was convicted nonetheless, and then agreed to cooperate against petitioner and admit to the crimes the two of them had committed.  The petitioner

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   claimed that this showed the witness had perjured himself to obtain favorable

2   consideration.

3       The court rejected this argument because these facts were fully aired before the

4   jury.

> Any proof that petitioner had to the effect that perjured
> testimony was being used against him could have been and
> was put into evidence.  The facts surrounding [the witness']
> previous trial were pointed out to the jury. [The witness]
> was **thoroughly cross-examined** concerning the testimony
> he gave at his trial, and the trial judge carefully charged the
> jury as to [the witness'] recantation, his possible motivation
> and accomplice testimony.  **It is the jury's duty to
> determine what testimony is believable and to reconcile
> inconsistent and conflicting testimony.  The jury did this
> and found the petitioner guilty.**

11  Cavell, 257 F.Supp. at 206 (emphasis added, citations to transcript omitted).  See also,

12  Stephens v. Hall, 407 F.3d 1195, 1206 (11th Cir. 2005); Morris v. Ylst, 447 F.3d 735,

13  745-46 (9th Cir. 2006).

14      Similarly, in this case, the defense thoroughly cross-examined both Kebede and

15  Lalander (and other witnesses) regarding the alleged inconsistencies in their testimony

16  in front of the jury.  The jury then did its duty.  It considered those facts, determined

17  what was significant and what was not, and found Mr. Almussa guilty.  None of the

18  defendant's arguments establish any grounds for throwing out that verdict.

19                      **IV.  CONCLUSION**

20      At the close of the almost two-week long trial, the Court made a finding on the

21  record that the defendant had been ably represented and had a fair trial.  After trial, a

22  duly empaneled jury found the defendant guilty on all counts after deliberating for a

23  //

24  //

25  //

26

27

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

little more than three hours.  None of the issues raised by the defense justifies disturbing that verdict, and defendant's motion should therefore be denied.

DATED this 16th day of January, 2007.

Respectfully submitted,

JOHN McKAY
United States Attorney

s/ *Vincent T. Lombardi*
VINCENT T. LOMBARDI
Assistant United States Attorney
WSBA 21967
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Telephone:  (206) 553-2462
Facsimile:  (206) 553-2422
E-mail: vince.lombardi@usdoj.gov

U.S. RESPONSE TO ALMUSSA MOTION
FOR NEW TRIAL - 21
(Almussa, CR05-381TSZ)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

# CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorney of record for the defendant.

s/ *Bonnie R. Wolfgram*

BONNIE R. WOLFGRAM
Legal Assistant
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: (206) 553-2520
FAX:   (206) 553-0755
E-mail: bonnie.wolfgram@usdoj.gov