The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO.   CR05-381TSZ |
| Plaintiff, | ) | |
| | ) | UNITED STATES' SENTENCING |
| v. | ) | MEMORANDUM |
| | ) | |
| AKRAM ASWAD ALMUSSA, | ) | *Hearing Date: October 19, 2007* |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I. INTRODUCTION AND RELIEF REQUESTED

Defendant is in violation of the terms of his appearance bond. It is extremely unlikely that he will actually appear at the sentencing hearing currently set for Friday, October 19, 2007. If Defendant does appear, the government will recommend that he be sentenced to 71 months, the top of the advisory range.

## II. BACKGROUND

A.   THE NATURE OF THE SCHEME

Sometime in 2003, Almussa's co-defendant, Josh Kebede, became a member of a large-scale mortgage fraud ring using the so-called "credit investor" mortgage fraud scheme. Kebede ultimately felt that he was not receiving all he was promised from the leaders of the other conspiracy.

It was in approximately this same time frame that he met Almussa, who was working at the time as a loan officer with a mortgage broker. Kebede described how the scheme worked, and Almussa agreed to assist Kebede.

U.S. SENTENCING MEMORANDUM - 1
(Almussa, CR05-381Z)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

The essence of both fraud schemes was to defraud mortgage companies by obtaining mortgage loans under false pretenses. First, Almussa and/or Kebede would enter into contracts to purchase residential real estate in arms-length transactions, thereby locking up the properties.

While those deals were still pending, the conspirators would recruit "straw buyers" to purchase the same property for an inflated purchase price. There is no disputing that the flip price was in fact inflated. First, as the Court will recall, the government was prepared to introduce evidence that (a) almost all of the homes at issue in this case were appraised by the same appraiser; and (b) that the appraisals were fatally flawed. *See, e.g.*, *Defense Motion to Exclude Proposed Expert Opinion (and Attachments)*, Docket 106. Since the trial, the government has retained Richard Hagar, SRA, to re-appraise each of the properties in question. Mr. Hagar's work confirms that the "flip" price was grossly inflated as compared to it's actual fair market value.

The conspirators would then cause the straw buyers to apply for loans to finance the inflated purchase price. Each loan application was made through Almussa, who worked as a loan officer at a mortgage brokerage. The loan application - which was prepared by Almussa - contained numerous material misrepresentations, including: (a) inflated income levels, (b) fake employment information, and (c) false promises to occupy the residence.

Almussa also took other steps to conceal the true nature of the transaction from the lenders. Specifically, Almussa provided falsified real estate purchase and sale agreements to the lenders. These purchase and sale agreements purport to be between the original seller and the straw buyer, omitting the intervening sale to Almussa and/or Kebede. In at least some instances, the original seller's signature was forged on this particular document. This false document operated to conceal the "flip" transaction from the lender, who would not have made the loan if they had known about the intervening sale.

U.S. SENTENCING MEMORANDUM - 2
(Almussa, CR05-381Z)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Almussa also caused third parties to make additional misrepresentations to the lenders to support the falsehoods on the loan application. For example, John Gonzalez admitted to acting as a recruiter for Almussa and Kebede. He has also admitted to providing false employment verifications for some of the straw buyers, at Almussa's specific request. Gonzalez has also pleaded guilty, testified at trial, and has been sentenced.

The legitimate sale and the "flip" sale to the straw buyer would close on the same day, through the same escrow. A portion of the fraudulently obtained loan proceeds would be used to pay the original, legitimate seller, with the balance used to pay the expenses of the conspiracy (including payouts to the straw buyers and other participants), with Almussa and/or Kebede pocketing the difference. Almussa and Kebede did at least four such transactions together, which were charged as part of Counts One (the conspiracy charge) and Eight (a stand-alone substantive wire-fraud charge). Almussa and Kebede had a falling out, and Almussa then proceeded to do additional transactions on his own, with no involvement from Kebede. Some of those transactions were the subject of Counts Two - Seven

Based on interviews with many of the participants, it appears that the goal of the scheme was to speculate in the then-hot real estate market. Almussa had poor credit due in part to a prior bankruptcy (more on this below), and accordingly could not legitimately borrow money to gamble on real estate.

Accordingly, Almussa resorted to using straw buyers with better credit to acquire control of real property, remodel and/or hold it, and then sell it later for a higher price, enabling the participants to pay off the original fraudulently-obtained loans, and make additional profits. A portion of the cash proceeds that flowed from the "flip" were to be used to pay construction costs and other expenses that went along with the remodeling process.

Ten separate transactions were discussed during the trial. The evidence established that the conspiracy as a whole pocketed just under $1 million in profit on just

U.S. SENTENCING MEMORANDUM - 3
(Almussa, CR05-381Z)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

the charged transactions ($990,570.25) discussed at trial.  Adding in the other related transactions would of course further increase that amount.

The overwhelming bulk of the excess loan funds went to Almussa.  Almussa also received an additional $112,121.99 in commissions on the fraudulent loans, which was pure profit for Almussa and not shared with his co-conspirators.[1]

**B.     LOSSES TO THE LENDERS**

Under the Guidelines a defendant's gain is not automatically the same as the victim's loss.  Instead, where collateral exists, the Court is obligated to reduce the gross loss amount by the amount recovered on disposition off the collateral  - or, if that has not occurred, by an estimate of the fair market value of the collateral as of the date of sentencing.  See, USSG 2B1.1, Application Note 3.E.ii.  In an appreciating market (like the Seattle housing market), this can sometimes result in the loss figure being smaller than the defendants' gain.

By the government's calculation, Almussa was responsible for approximately $406,849 in loss, which is arrived at by taking the fraudulent loan amount for each property, and subtracting the subsequent foreclosure or short-sale price.  Those calculations are summarized in paragraphs 14 - 24.[2]

More detailed loss information is still being compiled for purposes of calculating restitution.  The government therefore respectfully submits that the imposition of restitution be deferred, assuming that sentencing goes forward as scheduled.

---

[1] Almussa appears to have repatriated much of his profit to foreign locations.  An analysis of Almussa's bank records by Rick Lynn, a forensic accountant, shows that Almussa wired approximately $379,000 to accounts in Kuwait between December of 2003 and December of 2004.  After that date, and through August of 2005, approximately $76,000 was wired back into the United States from various other financial institutions in the Middle East.

[2] The loss on the 908 23rd Avenue Seattle property, referred to in paragraph 23 of the PSR, is approximately $12,000.  The fraudulent loan was for $305,000 (as compared to the real, arms-length purchase price of $154,500).  According to J.G., the straw buyer on the house, the property was sold at a short sale, with the lender's consent, for $293,000 to an LLC towards the end of 2006.  That LLC then resold the property for an even $300,000 in March of this year.  The additional $12,000 in loss does not change the Guidelines calculation contained in the PSR.

U.S. SENTENCING MEMORANDUM - 4
(Almussa, CR05-381Z)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

C.   **DEFENDANT'S HISTORY AND CHARACTERISTICS**

Defendant's basic biographical information is correctly outlined in the PSR. It is true that Almussa has no prior criminal convictions. However, this is by no means Almussa's first foray into fraudulent activities. Rather, Almussa has been repeatedly accused of, and sometimes sued for, fraud.

For example, the PSR refers to Almussa's prior employment at an art gallery. PSR, ¶ 81. The former owner of that venture, A.S., was interviewed by the FBI in late 2005. A copy of the report of interview of the owner was provided to the defense and to Probation. A,S. alleges that Almussa embezzled approximately $100,000 from the company prior to being terminated.

The PSR also refers to Almussa's bankruptcy, which was filed in the Western District of Washington, Cause No. 03-19103-G. PSR ¶ 80. A review of the bankruptcy file shows that numerous fraud claims were filed against Almussa by his creditors. For example, a man named Ray Cafarelli filed an adversary proceeding within the bankruptcy, alleging that Almussa had defrauded him by personally making false and misleading statements on a Uniform Residential Loan Application - the exact same form at issue in this case. Defendant ultimately settled that claim.

## III.   GUIDELINES CALCULATION

The government agrees with the Probation Office's Guidelines calculation. Pursuant to USSG § 2B1.1(a)(1) the base offense level is 7. It is increased by 14 levels, because the loss amount is greater than $400,000 but less than $1,000,000.

The government agrees that a four-level increase for Almussa's leadership role in the scheme is called for in this case. Mr. Almussa directly or indirectly recruited at least eight straw buyers in this case. In addition, he suborned co-defendant John Gonzalez to lie to the lender by fraudulently verifying some of the straw buyer's fake employment information.

Almussa went to trial, and now appears to have fled. He is therefore not entitled to any downward adjustment for acceptance of responsibility. This results in a total offense

U.S. SENTENCING MEMORANDUM - 5
(Almussa, CR05-381Z)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

level of 27. Almussa is criminal history category I, which results in a Guidelines range of 57-71 months.

## IV. RECOMMENDATION

The government respectfully recommends a sentence of 71 months, the top of the advisory Guidelines range.

A sentence of 71 months reflects the seriousness of the offense and the defendant's role in that offense. There is little dispute that the offense is extraordinarily serious. Since the trial of this case, it has become increasingly clear that the mortgage industry is afflicted with fraud at virtually every level. New Century Mortgage Corp., the primary victim in this matter, has since declared bankruptcy and is in the midst of liquidation. More generally, the dislocations in the subprime mortgage market have adversely impacted many other aspects of the economy. While it is certainly true that many of these problems are attributable to lax underwriting standards, poor lending decisions, and simple greed by lenders, fraud of this type is also a significant factor.

Almussa was a loan broker, a person who is supposed to act as an intermediary between people seeking to purchase houses, and entities prepared to lend money for that purpose. He abused his position to enrich himself, at the expense of both the lenders and some of the straw buyers. While some of the straw buyers knew or should have known they were aiding and abetting a fraud, others lacked sophistication and are themselves victims. The crimes in this case were not committed casually. Instead, they were the product of a calculated course of conduct, perpetrated over a long period of time, and involving considerable planning and sophistication.

In addition, Almussa's history and background show that this was not his first foray into fraudulent activities.

Finally, a sentence at the top of the Guidelines range is called for because the loss figure in this case understates Almussa's true culpability, for three reasons. First, Almussa has deliberately protracted this case, asking for numerous trial continuances and continuances of the sentencing hearing. One effect of the delay is that the general

U.S. SENTENCING MEMORANDUM - 6
(Almussa, CR05-381Z)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

increase in home values in Seattle, and therefore the increase in the victim's collateral, tended to mitigate the loss amount. Put another way, the delay in this case has artificially depressed the loss amount.

A second and related point is that Almussa netted significantly more in ill-gotten gains than the loss figure indicates. Almussa personally pocketed over $1 million in proceeds, money which was used to finance a lavish lifestyle.

Third, and perhaps most important, fraud schemes of this type cause market distortions that harm the community in ways that go above and beyond the loss to specific lenders. Individuals, real estate professionals, and government entities all look at past comparable sale data in making decisions involving real estate. Flip transactions of this type introduce incorrect pricing data into the market, which then infects decisions made by other unwitting market participants.

For example, a fraudulently inflated sale price to a straw buyer may be used by an unwitting appraiser to determine the value of neighboring properties in calculating real estate taxes. When a house that is worth $110,000 is "sold" in a non-arms length transaction to a straw buyer for $210,000, a tax assessor likely will not detect that this was not a market sale. Instead, the taxing authorities may use the flip price as a comparable in determining the tax value of neighboring properties. This results in incorrect, and higher, tax assessments for neighbors. The Guidelines do not reflect this harm in any way.

///
///
///

U.S. SENTENCING MEMORANDUM - 7
(Almussa, CR05-381Z)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

## V.  CONCLUSION

For the reasons set forth above, the government respectfully recommends the Court impose a term of 71 months of incarceration, to be followed by five years of supervision on the terms outlined in the PSR.  The government further submits that the imposition of a restitution amount be deferred no more than sixty days.

DATED this 15th day of October, 2007.

Respectfully submitted,

JEFFREY C. SULLIVAN
United States Attorney

/s/ Vincent T. Lombardi
VINCENT T. LOMBARDI
WSBA # 21967
Assistant United States Attorney
700 Stewart Street, Ste. 5220
Seattle, Washington 98101
Facsimile: 206-553-4440
Phone: 206-553-5178
E-mail: vince.lombardi@usdoj.gov

U.S. SENTENCING MEMORANDUM - 8
(Almussa, CR05-381Z)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorney of record for the defendant.

s/ *Bonnie R. Wolfgram*
BONNIE R. WOLFGRAM
Legal Assistant
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: (206) 553-2520
FAX:   (206) 553-0755
E-mail: bonnie.wolfgram@usdoj.gov